UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X    **14 CV 7955 (JSR)**
JON SAVOY,

                                  Plaintiff(s),

               -against-    **FIRST AMENDED
COMPLAINT**

THE CITY OF NEW YORK; POLICE OFFICER GLENN
HUDECEK, Shield No. 18059 of the BXTF; CHIEF
JOSEPH ESPOSITO; ASSISTANT CHIEF THOMAS    JURY TRIAL
PURTELL; CAPTAIN JACK JASKARAN; and JANE and    DEMANDED
JOHN DOES 4-40,

                          Defendants.    ECF CASE

-------------------------------------------------------------------X

       Plaintiff JON SAVOY, by his attorney CHRISTOPHER H. FITZGERALD,
complaining of the defendants, respectfully alleges the following:

## I.    PRELIMINARY STATEMENT

1.       Plaintiff JON SAVOY brings this action for compensatory damages,
punitive damages, and attorney's fees pursuant to 42 U.S.C. § 1983 and 42 U.S.C.
§ 1988 for violations of his civil rights, as said rights are secured by said statutes
and the Constitutions of the State of New York and the United States.

## II.    JURISDICTION

2.       This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, and the
First, Fourth and Fourteenth Amendments to the United States Constitution.
Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343(3) and (4)
and the aforementioned statutory and constitutional provisions.

## III.    VENUE

3.       Venue is proper for the United States District Court for the Southern
District of New York, pursuant to 28 U.S.C. §§ 1391(a), (b), and (c) and §
1402(b) because Defendant CITY of NEW YORK maintains its primary and
relevant places of business in this district.

## IV.    **JURY DEMAND**

4.        Plaintiff respectfully demands a trial by jury of all issues in this matter pursuant to Fed. R. Civ. P. 38(b).

## V.    **THE PARTIES**

5.        That at all times hereinafter mentioned, the plaintiff was a resident of the County of the Kings, City and State of New York.

6.        That at all times hereinafter mentioned, the defendant, THE CITY OF NEW YORK, was and is a municipal corporation, duly organized and existing under by virtue of the laws of the State of New York.

7.        That at all times hereinafter mentioned, the defendant, NEW YORK CITY POLICE DEPARTMENT, was and is a municipal corporation, duly organized and existing under by virtue of the laws of the State of New York.

8.        Defendants POLICE OFFICER GLENN HUDECEK, Shield No. 18059 of the BXTF ("HUDECEK"), Chief Joseph Esposito ("ESPOSITO"), Assistant Chief Thomas Purtell ("PURTELL"), and Captain Jack Jaskaran ("JASKARAN") are members of the New York City Police Department previously identified as JOHN or JANE DOES in the original Complaint.

9.        Defendants JOHN or JANE DOES 4– 40 are yet unidentified New York City police officials, officers or command staff who caused or did arrest the plaintiff. These as-yet-unidentified defendants engaged in the mass arrest notwithstanding the absence of probable cause or lawful justification. These defendants knew that the NYPD had permitted and/or conveyed permission to the marchers to conduct their march and, ultimately, to be upon the bridge roadway. These defendants knew that police had escorted and led marchers onto the roadway and then, minutes later, arrested the plaintiff for being present upon the roadway onto which police had just led and escorted them. These defendants are sued in their individual and official capacities.

10.        That at all times hereinafter mentioned, the defendants named above, were and still are employed with the NEW YORK CITY POLICE DEPARTMENT.

11.        That at all times hereinafter mentioned, the defendant officers were acting within the scope and course of their employment with the New York Police Department, and under color of state law.

12.        That at all times hereinafter mentioned, all of the actions of the officers and detectives alleged herein was done within the scope and course of his or her employment with the New York Police Department and under the color of state law.

2

13.     That all of the causes of action pleaded herein fall within one or more of the exceptions set forth in New York's Civil Practice Law & Rules 1602 with respect to joint and several liability.

## STATEMENT OF FACTS

14.     On or about October 1, 2011, plaintiff JON SAVOY was peacefully and lawfully participating in the march which was part of the Occupy Wall Street Movement ("the Occupy Movement"), when the police led, escorted, and permitted the march onto the Brooklyn Bridge roadway.

15.     At no point on that day did plaintiff hear any warnings or orders not to proceed onto the bridge roadway.

16.     Plaintiff understood passage upon the roadway to be permitted by police.

17.     After leading the demonstration well out onto the Brooklyn Bridge, defendants without cause, notice and opportunity to comply with any order, trapped and arrested plaintiff, boxed plaintiff in without avenue of exit, and falsely detained and arrested plaintiff in the absence of probable cause.

18.     In advance of the October 1, 2011, march that is the subject of this Complaint, the defendants had knowledge of the Occupy movement, the physical encampment and base of operations at Zuccotti Park, and the fact that persons associated with the Occupy movement had engaged in First Amendment protected activities, including political marches, as a form of political expression and action.

19.     Chief ESPOSITO oversaw the planning of the police response to the entire day's event.

20.     ESPOSITO was the ranking officer on-scene and, ultimately, is the person who decided and gave the order to mass arrest.

21.     Throughout the march, ESPOSITO would move throughout all parts of the march, but much or most of his time was spent at the lead of the march. Chief ESPOSITO is the on-scene ranking official at all key moments.

22.     In advance of the October 1, 2011 march, the NYPD had knowledge that a march would occur on October 1, 2011 from Zuccotti Park to the Brooklyn Bridge Park where there was an announced event with speakers including Amiri Baraka, author, poet and playwright.

23.     On October 1, 2011 demonstrators began marching from Zuccotti Park near Wall Street, which the demonstrators dubbed Liberty Square.

24.      The march moved initially from Zuccotti Park towards the Brooklyn Bridge.

25.      The NYPD presence at Zuccotti Park and along the march was substantial, consisting of the deployment of officers on foot, officers on bicycles, officers on motorscooters and/or motorcycles, officers in cruisers and officers in other types of vehicles.

26.      On September 26, 2011, Assistant Chief THOMAS P. PURTELL, Commanding Officer, Patrol Borough Manhattan South requested deployment of a substantial array of resources to respond to the "sleep-in" or park-based aspect of the OWS protest, including 128 officers, 16 Sergeants, and 6 Lieutenants for October 1, 2011.  These officers were available to respond to OWS related situations, including the October 1, 2011, march. The Manhattan South Task Force was placed on "alert" status, a status which would facilitate rapid response where needed.

27.      On September 29, 2011, PURTELL requested an additional array of "supplemental coverage" in "anticipation of a protest march and possible civil disobedience to be conducted on Saturday October 1, 2011."  This march-specific requisition added 192 officers, 24 Sergeants, 4 Lieutenants, and 24 vans from the patrol service bureau. In addition, it also requisitioned the "Barrier Section" for the "placement of barriers for subject event," the Manhattan South Force Task Force with available vans and patrol wagons, the Manhattan Traffic Task Force to regulate and divert pedestrian and vehicular traffic, one Department Attorney from the Legal Bureau to provide on-site legal advice, the Technical Assistance and Response Unit (TARU), Community Affairs officers, Intelligence resources, among other substantial resources to police the planned march.

28.      Additional details or contingents of officers and resources, beyond those referenced above, were deployed to respond to the march.

29.      Police had staged and arrayed their resources, personnel and assets including officers, weapons, amplified sound equipment and other crowd control devices sufficient for the march and crowd control.

30.      NYPD command staff monitored the movement of the march, including in the police headquarters and in command centers, including mobile command centers.

31.      One Police Plaza is located at the base of the Brooklyn Bridge.

32.      Defendant ESPOSITO monitored the march as it proceeded.

33.      The defendants were aware of the start of the march.

34.     The NYPD did not impede, the start of the march from Zuccotti Park.

35.     The NYPD permitted the march to proceed upon the public ways from Zuccotti Park and through downtown Manhattan.

36.     This was a police escorted march.

37.     According to Chief ESPOSITO, "police officers [were] escorting the march along its route." According to ESPOSITO, escorting officers "had been walking alongside [the] side, we walked in front, we walked in back."

38.     The conduct and involvement of the police in directing and/or escorting the march sanctioned the march and communicated permission to march.

39.     In appellate filings, Defendants concede that the non-verbal and implicit conduct and signaling by police conveyed permission for the march to proceed at least as far as the Brooklyn Bridge.

40.     At no point did ESPOSITO or the NYPD issue fair warning or notice of revocation of permission to march to the plaintiff.

41.     In appellate filings, Defendants concede the march was "a reasonably orderly march to the Bridge."

42.     The NYPD permitted the march to proceed to the Brooklyn Bridge and, ultimately, permitted the march to proceed upon the vehicular roadway of the Brooklyn Bridge.

43.     The NYPD used officers, including flanking the march with officers on motorscooters or motorcycles, to escort the march from Zuccotti Park to the Brooklyn Bridge.

44.     The NYPD deployed "the Scooter Task Force" to escort the march. A function of the scooters or motorcycles was to form a line flanking the front of the march, to communicate through presence that the line was to not be crossed and to differentiate between public space that police were permitting marchers to use from public space that police were prohibiting use of.

45.     According to PURTELL, "the lead element for the police department were on the scooters" and the "front of the escorting officers were all on scooters."

46.     Likewise, the function of escorting officers on foot and, in general, is to signal by presence and otherwise what areas are permitted for marchers to proceed upon and what areas are prohibited.

47.　　　　Provision of a police escort has a communicative quality. It conveys permission for marchers to be present within the escort or as indicated by the presence of the escort.

48.　　　　As a matter of policy/practice and consistent with NYPD training the provision of marches conveys permission to march. "Lawful . . . marches must be provided police escorts that will demonstrate the Department's resolve to protect the right to dissent while providing public safety."  NYPD Sergeant Leadership Course, Disorder Control (rev'n March 6, 2009).

49.　　　　According to ESPOSITO, sometimes police will deploy scooters to form a barrier to signal or deny access to a prohibited area.

50.　　　　According to ESPOSITO, for a typical one-way street, only five or six scooters would be needed to block the entrance to a single lane roadway.

51.　　　　Although he does not know how many in total were deployed on this day, PURTELL has testified that "normally, we would have maybe 24."

52.　　　　No less than sixteen scooters accompanied the October 1, 2011, march.

53.　　　　The police also possess orange mesh netting to achieve a similar blocking effect. According to ESPOSITO, mesh netting is a "force multiplier" so that just three or four officers spread out five or six feet apart along the netting can block a much larger area than without the mesh. According to ESPOSITO, "Sometimes just the visual of [the mesh] there will stop someone from crossing over." Mesh netting was available to the police in connection with the October 1, 2011, march to signal what areas were permissible or prohibited for marchers.

54.　　　　The NYPD officers escorting the march "guided" and exercised control over the conduct of the march through their physical presence, show of police force and authority, and specifically through the issuance of orders and directives to individuals within the march.

55.　　　　The march as a whole, and the individuals within the march, understood that the NYPD was escorting and permitting the march to proceed.

56.　　　　As the march proceeded towards the Brooklyn Bridge, the NYPD knew and observed that the march of several thousand individuals was compliant with police directives and, indeed, "followed [the police directives]."

57.　　　　At points and times, the police directed and permitted marchers to proceed in ways ordinarily prohibited under traffic regulations absent police directive or permission. According to Chief ESPOSITO, at times police will ignore the traffic signs or signals and let marchers go anyway. The police adapt according to the situation.

58.     At some intersections along the march, police blocked vehicular traffic, directing and permitting marchers to cross the street against the traffic signal.

59.     Marchers relied on the orders and signals by the police that this, ordinarily prohibited, conduct was at that particular time and place being allowed by the police who were guiding and escorting the march.

60.     In general, the marchers relied on the police for directives and indications as to what actions were being permitted at what times, so that they could conform their conduct and comply with the orders and indications being given by police.

61.     Later in the march, when police led and escorted and permitted marchers *en masse* onto the roadway of the Brooklyn Bridge, marchers understood that they were being led and escorted and permitted onto the roadway of the Brooklyn Bridge.

62.     The police deprived the plaintiff of any fair notice that following the lead and escort of police across the bridge roadway was somehow prohibited.

63.     As the front of the march reached City Hall Park, those in the front of the march crossed Centre Street and moved to the pedestrian walkway or promenade of the Brooklyn Bridge.

64.     According to Detail Commander PURTELL, police anticipated using officers to block vehicular traffic at Centre Street and direct marchers to use the roadway against the light in order to "facilitate the march."

65.     When the front section of the march encountered the narrow pedestrian walkway of the bridge, there was a natural congestion as the large group began to file onto the smaller walkway. It took some period of time for the first portion of the march to enter upon the walkway, which occurred without disturbance.

66.     At the entrance point to the walkway flowing back across Centre Street, along Park Row and in the broad sidewalks abutting City Hall Park, thousands more were in procession. This mass procession had been occurring for a substantial time without any noncompliance.

67.     Police, including command officials, ESPOSITO, PURTELL, and other city officials, stood in an eastbound roadway on-ramp at the entrance of the bridge.

68.     The police observed the congestion of persons in the roadway near the entrance to the Brooklyn Bridge promenade.

69.     The command officials gave no *audible* warnings or orders to the mass of people assembled.

70.     Captain JACK JASKARAN, consulting with a person believed to be an NYPD Attorney, spoke inaudibly into a bullhorn that could not be heard mere feet away from the officer, given ambient noise.

71.     Within a period of five minutes, the officer made statements into the bullhorn including at the end a rapid and quick succession of statements. These generally inaudible statements appear from TARU video to request that anyone who might have been within earshot leave the roadway and at the end that failure to comply would result in arrest.

72.     The NYPD, including ESPOSITO, knew no audible communication was given to the hundreds and thousands potentially subject to arrest.

73.     The NYPD, including ESPOSITO, also knew that the Constitution requires that any ostensible command must be heard by those who are expected to be bound by it.

74.     There was no attempt by the NYPD to communicate a command, order or other message to the whole of the mass of people at the base of the bridge or subject to potential arrest.

75.     The set of directives at the entrance to the bridge could have been heard, if at all, by only a handful of people.

76.     These directives were not audible, and thus not given, to the vast majority of people congested at the entrance to the bridge.

77.     They were not audible to the hundreds of persons upon the pedestrian walkway.

78.     They were not audible to the thousands of people upon and across Centre Street, and filling blocks of sidewalk space abutting and wrapping around City Hall Park.

79.     No directive or command from the NYPD were audible to the plaintiff.

80.     The police possess amplified sound equipment sufficient to project and be heard for blocks.

81.     Having initially stood in the eastbound roadway on-ramp to the Brooklyn Bridge, ESPOSITO, the command staff and police at the roadway entrance then turned around, gave way, and led the midsection of the march across the bridge.

82.     The demeanor of the police officials and command staff leading the march across the bridge was casual and even somewhat jocular, as they casually chatted with each other, some carrying coffee.

83.     From that moment on, no orders were issued from the police at the roadway entrance for the ongoing flow of marchers to not proceed on the roadway.

84.     Captain JASKARAN, the single officer with the hand held battery operated bullhorn, was withdrawn from the on-ramp entrance and joined the command staff and others leading the march on the roadway across the bridge.

85.     Police continued to escort the march along its side, with no police on the flanks ordering or directing the march they had been escorting that afternoon against entering or being present upon the bridge. On the contrary, these officers - - who had not hesitated at any time during the march towards the Bridge to direct people on the sidewalks when they so desired - - did not warn against entering or continuing upon the Bridge roadway.

86.     As marchers, including plaintiff, followed the police officials onto the Brooklyn Bridge roadway, there was no effort by the police to stop the marchers from entering or continuing upon the roadway. On the contrary, NYPD command staff or "white shirts" led the march.

87.     Police not only led the march onto the Bridge roadway but escorted the marchers alongside as they walked onto the bridge.

88.     At the time that Chief ESPOSITO turned and started walking up the bridge, he thought to himself and formed the intention and/or belief that "I think I'm going to have to arrest these folks."

89.     Chief ESPOSITO admits that police resources were present that could have been used to prevent the hundreds of people from streaming onto the on-ramp.

90.     The NYPD Chief of Department JOSEPH ESPOSITO made a deliberate and conscious decision, which he candidly concedes in hindsight constituted "error," to not use police resources to dissuade or block marchers from flowing onto the on-ramp. ESPOSITO claims he believed that blocking the on-ramp would make it more difficult to legally justify a mass arrest because, in his view, he "did not want to be guilty of stopping traffic, the police stopping traffic. . . . They can't be charged with blocking traffic if the police had stopped traffic already."

91.     Instead, policy maker ESPOSITO opened up the on-ramp to the flow of marchers, including leading and escorting hundreds of marchers - - who were marching believing they were marching with police permission conveyed by the escort, among other factors - - onto the bridge roadway.

92.      A few minutes later, ESPOSITO ordered the arrest of all the marchers on the roadway.

93.      The municipality provided no warning or notice to the plaintiffs or the plaintiff as a whole of revocation of permission to march, that following the apparent invitation and lead and escort of police onto the roadway was prohibited, and no opportunity to comply with lawful police directives to disperse prior to the mass arrest.

94.      In ESPOSITO's own words, "Hindsight being 20/20, I should have used the scooters to block . . . it was a technical error on my part."

95.      ESPOSITO and the NYPD also had available mesh netting, but did not deploy it at the base of the on-ramp to signal it was prohibited to follow within the police escorted march onto the roadway.

96.      Police permitted or conveyed permission for the march to proceed upon the roadway of the bridge by escorting the march and leading the march thereupon.

97.      By leading and escorting the march, the police objectively communicated actual or apparent permission to proceed within the police escorted march. The police escort constituted and manifested a form of communication or signal that was reasonably understood by plaintiffs as conveying permission or invitation to march.

98.      According to PURTELL, officers were directed to "keep moving further up" the roadway.

99.      The police led the march across the bridge - - a decision which would hardly be viewed by march participants or observers as unlikely, given that traversing the roadway or a portion of the roadway would have affected an orderly and faster movement of the march across.

100.     When the police turned and led the march onto the roadway, those who could see this actual and apparent grant of permission to follow let out a cheer believing police were permitting them to cross the bridge on the roadway.

101.     Throughout the crowd that was near the entrance to the bridge was heard spontaneous exclamations excitedly shouted out, "They're letting us [cross the bridge on the road]!"

102.     After the police led and escorted the march onto the roadway, scores of the marchers who had originally entered upon the pedestrian walkway joined the others on the roadway when it became clear that police were leading and escorting and permitting marchers to use the roadway to cross the bridge.

103.     After the police turned and led marchers onto the on-ramp, hundreds of marchers - - who had no knowledge or awareness of Jaskaran's orders or of police interactions with any persons at the base of the on-ramp - - streamed onto the on-ramp escorted and led by police.

104.     According to Chief ESPOSITO, only approximately "a couple of hundred" or "maybe 200" protestors were actually congested in the intersection when he and police turned and walked up the on-ramp.

105.     Yet, nearly 700 persons were arrested. In others words, the City, acting through its Police Chief, knowingly arrested *hundreds of others* who were not even in the roadway - - and who certainly did not hear JASKARAN's warnings - - but who were escorted and led to be on the roadway by police. Only the front rank of demonstrators heard Captain Jaskaran's earlier and few warnings at the on-ramp entrance. The vast majority of protestors did not.

106.     The on-ramp continues for some distance, narrowing to just one lane across. Where the single lane on-ramp transitions to the broader bridge span, essentially a narrow chokepoint were it to be used as such, Chief ESPOSITO and the NYPD undertook no efforts to dissuade marchers from following their lead and escort onto the multi-span roadway. Chief Esposito with scores of officers instead led the march forward.

107.     The width of the on-ramp at this transition point is just a number of feet across. Chief ESPOSITO walked at the lead. He did not direct and no leading or escorting officers undertook to use any effort - - not even verbal persuasion - - to dissuade marchers from following the police's lead and escort onto the roadway. Here, too, mesh - - though available - - was not deployed. Officers, who numbered no less than 40 at the lead with scores more in escort, did not stop and signal even with their hands for marchers to not follow. Police did not form a line, even though this point was so narrow that they could easily have stood shoulder to shoulder. There was no verbal and no visual signal for marchers to not follow. On the contrary, the clear communicative message of the ongoing police lead and escort was that it was permissible for marchers to continue in the police escorted march, as the police escorted the march with no efforts at dissuasion onto the multiple lane bridge span roadway of the Brooklyn Bridge.

108.     Far from dissuasion, officers escorted marchers onto the roadway. The provision of escort conveyed permission and sanction to proceed as apparently escorted and led onto the bridge roadway.

109.     The officers objectively appeared to be escorting officers. Indeed, when Incident Commander THOMAS PURTELL was shown video of a number of uniformed officers moving upon the roadway and was asked whether they were arresting or escorting officers, he responded "I'm assuming they were escort officers."

110.    For some period of time or distance, escorting officers formed a line between marchers and vehicles entering via the other on-ramps. Police waved on the traffic to continue moving and flanked the movement of marchers. In other words, traffic was not stopped by the presence of protestors in a mere portion of the roadway.

111.    Chief ESPOSITO later gave an order to stop vehicular traffic on the bridge.

112.    The police stopped the traffic on the bridge.

113.    ESPOSITO's order was put out over police radio. According to ESPOSITO, "I said stop traffic on the bridge and somebody put it out on the radio." Thomas PURTELL confirmed that he "broadcasted a request for someone to cut the traffic off. . ."

114.    When Plaintiff approached the Brooklyn Bridge, he observed marchers entering the pedestrian walkway and the resulting bottleneck. He also observed marchers begin to walk on the roadway of the bridge. After observing what he believed to be several hundred persons entering the roadway, he followed them, knowing that the destination was a park in Brooklyn. During the period he was at the base of the bridge observing others' movements, he did not hear any police orders. He did not hear any orders or directives not to proceed to follow the march on the roadway. When he marched on the bridge roadway he observed officers alongside the march. These officers did not give him or others any directives. The police gave plaintiff the impression and understanding that they were permitting and escorting the march across the bridge.

115.    The police, having led and escorted hundreds of marchers upon the roadway of the Brooklyn Bridge, mid-way across the bridge arrested over seven hundred people for being present upon the bridge, including plaintiff, precisely where the police had led them and permitted them to march.

116.    Prior to terminating the march when it was mid-way across the bridge, the police did not convey that they were going to revoke the actual and apparent permission of the march to proceed.

117.    Midway across the bridge, when the police stopped all forward movement of the march, an officer spoke inaudibly into a bullhorn that could not be heard mere feet away from the officer, given ambient noise.

118.    Again, the NYPD knew no audible communication was given.

119.    The plaintiff and his fellow marchers were blocked from forward movement by the police.

120.     Police used mesh netting to signal that forward movement was prohibited. According to Chief ESPOSITO, no force was used to cause the march to stop.

121.     The plaintiff and his fellow marchers were ultimately prevented from moving backward as the NYPD prevented dispersal through the use of orange netting and police vehicles.

122.     Chief ESPOSITO admits that the individuals trapped on the roadway did not react violently.

123.     ESPOSITO and the NYPD could have, at that time, communicated an order to disperse or other lawful orders to those seized and under police control. They did not give notice of revocation of permission to demonstrate before they began arrests. They did not issue dispersal orders and afford marchers an opportunity to comply. They blocked off avenues of exit and trapped marchers so that they could not even disperse of their own initiative. They simply, without warning or notice, executed the mass arrest at the directive of Chief ESPOSITO. They did so knowing that hundreds of persons had flowed onto the roadway following the police escort and lead.

124.     The NYPD's actions were not only unconstitutional, they were dangerous. The NYPD's actions put hundreds of persons in jeopardy of injury from forced compression of people with no avenue of escape, threat of injury from stampede, or being forced over the side of the bridge.

125.     All of the defendant officers or persons who participated in, or otherwise caused, the arrests of the plaintiffs or plaintiff did so in disregard of their actual knowledge that the march had been permitted and led and escorted onto the roadway of the bridge.

126.     Defendants deployed orange nets and encircled plaintiff and other marchers.

127.     Within several minutes, buses from the Department of Corrections arrived on the scene.

128.     The plaintiff and other marchers were ultimately prevented from moving backward as the NYPD prevented dispersal through the use of orange netting and police vehicles.

129.     Upon information and belief, plaintiff was placed in zip tie cuffs by defendant POLICE OFFICER GLENN HUDECEK, and/or other defendants, and placed onto the Department of Corrections Busses.

130.     The speed with which the nets, and buses materialized indicated that defendants had planned the entire operation as a trap to arrest the marchers.

131.        Plaintiff was brought to Manhattan Central Booking and detained for approximately 20 hours.

132.        Plaintiff was given a Desk Appearance Ticket, dated October 1, 2011, under which he was charged with a violation of New York Penal Law §240.20(5), signed by defendant POLICE OFFICER GLENN HUDECEK, Shield No. 18059 of the BXTF.

133.        The prosecution against plaintiff continued under Criminal Court Docket No. 2011NY080106, for which he was required to appear in court on eleven (11) subsequent occasions from the time of his arrest until August 6, 2013.

134.        On August 6, 2013, the charges against Plaintiff were finally dismissed.

135.        At no time did the plaintiff fail to obey a police order.

136.        At no time did the plaintiff engage in disorderly conduct.

137.        At no time did the plaintiff illegally block vehicular traffic on the Brooklyn Bridge, as the police had stopped vehicular traffic, opened up the roadway to pedestrian traffic, and themselves led and escorted the demonstration onto the roadway with police command officials at the lead.

138.        At no time did the plaintiff engage in parading without a permit, as the march of several thousand was permitted to proceed and escorted by police throughout and there was never any notice to the class that such permission had been revoked.

139.        The NYPD engaged in a mass falsification of arrest documents in order to subject the plaintiff to the injury of criminal process.

### Continued Adverse Effects and Future Recurrence

140.        The continued existence of the trap-and-arrest policy, practice and custom imposes an objective and substantial chilling effect on the exercise of free speech and assembly rights.

141.        The continuation of the policies, practices and customs challenged herein places persons within the plaintiff's class at risk for future false arrest should they continue to associate with protest and march activity in New York City. The risk presented by these practices is that a person - - no matter how law abiding his or her conduct - - is at risk for sudden and indiscriminate false arrest simply by virtue of being physically present near protest activity. The only way to be certain of avoiding false arrest is to avoid protest and march activities.

142.     The practices complained of reflect a citywide practice, practice or custom of trapping and arresting targeted protests. They are not the results of errant low level officers acting in violation of policy, but are the results of policy, practice or custom itself.

143.     On information and belief, some number of the persons arrested in the October 1, 2011 mass false arrest had previously been arrested in prior trap-and-arrest executions, including those that occurred on September 24, 2011. With the persistent occurrence of ongoing Occupy-related marches and activities, there is a real and immediate threat of recurrence that will affect members within the class.

144.     A person of reasonable firmness who wishes to engage in free speech and expressive activities is chilled in the exercise of those rights by this risk.

145.     Individuals in the same or similar situation as plaintiff have been chilled, and suffer ongoing, continued, and objectively reasonable chilling of their free speech activities and will continue to suffer unless and until the indiscriminate trap-and-arrest tactics are ceased voluntarily by consent decree or through injunctive relief.

146.     This chilling effect does not necessarily mean a complete termination of protest activities by those affected, but it does mean that ordinary people must curtail or limit their participation in First Amendment protected activities in order to avoid severe personal or professional or other repercussions/injuries from false arrest.

147.     Persons exercising their First Amendment rights in New York City by engaging in demonstration activities cannot, by conforming their conduct to the law, avoid arrest where the NYPD is allowed to conduct mass trap and detain arrests.

148.     Plaintiff, since his October 1, 2011 arrest, has completely ceased participating in any further activities in expressing his First Amendment right, for fear of being arrested again.

**UNCONSTITUTIONAL POLICIES AND PRACTICES**

149.     The CITY OF NEW YORK and the NYPD maintain the policy, practice and/or custom of abusing state authority to disturb and disrupt targeted civil political assembly and mass demonstrations.

150.     The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass false arrests of protesters in the absence of probable cause.

151.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests without having probable cause to arrest the group as a group; and without having individualized or particularized probable cause to arrest each person within the mass group to be arrested.

152.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in indiscriminate or dragnet-style arrests of protesters in the absence of individualized probable cause, a practice typified by the NYPD's use of orange netting to capture and arrest masses of people without regard to whether there exists probable cause to arrest the individuals trapped in such sweeping seizures.

153.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests of targeted protests without regard, or with disregard, as to whether the target group contains persons for whom there is no probable cause to arrest.

154.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of engaging in mass group arrests of protesters without giving the group fair notice, warnings or order to disperse (or to comply with lawful police directives), and without giving a meaningful and reasonable opportunity to comply.

155.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of tolerating and failing to discipline unlawful police conduct against protesters including specifically, false arrest.

156.    The CITY OF NEW YORK and the NYPD maintain a policy, practice and/or custom of causing or justifying arrests for parading without a permit as a strict liability violation in the absence of knowledge or *mens rea.* This policy caused or is used by the Defendants to justify the arrest of the plaintiff.

**DIRECT PARTICIPATION, APPROVAL AND RATIFICATION OF THE MASS ARREST DECISION BY PERSONS WITH SUFFICIENT POLICY MAKING AUTHORITY AS TO BIND THE MUNICIPALITY**

157.    Defendant Chief ESPOSITO directly participated, approved or ratified the mass arrest decision, with sufficient actual or delegated policy making authority to establish municipal liability.

158.    Chief ESPOSITO ordered the arrest of the demonstrators.

159.    Chief ESPOSITO has admitted, "I ordered the arrest of the demonstrators."

160.    ESPOSITO conferred with Police Commissioner Ray Kelly prior to the mass arrest specifically about the mass arrest of the marchers on the Brooklyn Bridge as events unfolded, and secured Kelly's approval of the arrest decision.

161.    At some point prior to the mass arrest execution, and after marchers were physically present on the roadway, Chief ESPOSITO called Police Commissioner Kelly and advised that the NYPD would "probably make an arrest" of the marchers.

162.    According to ESPOSITO, "I know I spoke to him while the incident was ongoing."

163.    Chief ESPOSITO attests that his understanding is that what he was doing was approved by Commissioner Kelly.

164.    According to ESPOSITO, after the arrest was completed he spoke with Commissioner Kelly a few times. That day, he advised either Commissioner Kelly or a member of his staff that the arrest was complete and the bridge was open. ESPOSITO spoke to Commissioner Kelly also the next day or two days later about the arrest.

165.    Defendant JOSEPH ESPOSITO, as NYPD Chief of Department, by operation of law and NYPD organization was the highest ranking uniform officer in the NYPD. The only person with a higher rank than he within the NYPD was the Police Commissioner.

166.    As Chief of Department, ESPOSITO possessed and exercised actual or delegated policymaking authority for purposes of municipal liability under section 1983.

167.    ESPOSITO's job functions included that he did "direct and control the daily operations of the major enforcement bureaus/commands within the Department including: the Patrol Services Bureau. . . ." *See* NYPD Organizational Guide, Procedure No. 101-04, Chief of Department (effective 4/20/2001).

168.    On the date of the underlying events, the Civil Disorder Unit was organizationally placed underneath and within the Patrol Services Bureau. *See* NYPD Organizational Guide, Interim Order 1-2 (issued 7/13/2011).

169.    ESPOSITO, as Chief of Department, had plenary and policy making control and authority over the Civil Disorder Unit and the response to major events such as the underlying OWS march. Among ESPOSITO's functions for the Disorder Control Unit included that he: "Conduct a comprehensive review of all Department plans and training for responding to civil disorders. Develop and recommend specialized training for inclusion in Police Academy curriculum for all  the service regarding crowd management and disorders control to insure the

17

Department's readiness. Develop and run tabletop, command post and no notice drills to assess readiness of the Department to respond to varied threats. Use these practical drills to reinforce Police Academy training in emergency response to civil disorder and other major events. Coordinate, in conjunction with the Chief of Patrol, the response of the borough task forces during major disorders and other major events, and ensure adequate citywide availability for secondary events. Conduct tactical reviews of major or sensitive events to assess the command and control systems and strategies of the Department. Assess and assist in major event planning and execution of these plans. Develop new strategies and programs to improve performance, consistent with the goals and strategies of the Department. Recommend the acquisition of equipment to support disorder and crown control operations." *See* NYPD Organization Guide, Interim Order 6-5, Organizational Change: Reorganization of Chief of Department (issued 5/8/2007).

170.    ESPOSITO admits that he had the authority "to direct and control the Disorder Control Unit" and, further, that he did not need to check with the Commissioner before exercising direction and control over the Disorder Control Unit.

171.    ESPOSITO possessed actual or delegated final policy making authority over the NYPD, including specifically the Disorder Control Unit and demonstration related responsibilities.

172.    Police Commissioner Kelly afforded ESPOSITO final policy making authority.

173.    According to ESPOSITO, in his capacity as Chief of Department he issued memoranda or other directives that were department wide in scope.

174.    Among the vehicles ESPOSITO used to establish Department wide policy were "Chief of Department memos." The operative effect of these Departmental directives was that "They would go down the chain of command. People would read them and do what they said," according to ESPOSITO.

175.    There was no requirement upon ESPOSITO that his Chief of Department memos be reviewed in advance and signed off by the Police Commissioner. ESPOSITO, as Chief of Department, had the authority to establish departmental policy of his own initiative and authority.

176.    There are no written rules or procedures that required ESPOSITO, as Chief of Department, to consult with the Police Commissioner prior to issuing Department wide directives, i.e., policy.

177.    According to ESPOSITO, the only limitation on his exercise of authority to issue directives as Chief of Department and for prior consultation with the

Commissioner was "my common sense." If, within his sole discretion, he felt he should consult, then he did. There was no requirement.

178.     In the course of his lengthy tenure as Chief, ESPOSITO believes only once or twice did the Commissioner ever tell him that he exceeded his authority and should have first run something past him before issuance.

179.     Reflecting ESPOSITO's substantial policy making discretion and authority, the NYPD, by letter dated March 11, 2011, to the City of New York Conflicts of Interest Board identified ESPOSITO as one of multiple listed "managers in the New York City Police Department who fall under the Substantial Policy Discretion Rule of the Conflicts of Interest Board."

**ACTUAL OR DE FACTO POLICY UNCONSTITUTIONALLY DENYING FAIR WARNING OR NOTICE TO OCCUPY WALL STREET MARCHES**

180.     The CITY OF NEW YORK and the NYPD maintained a *de facto* policy, practice and/or custom of permitting OWS marches without the concomitant and constitutional requirement of fair warning or notice of revocation of permission (and opportunity to comply with lawful police orders) prior to mass arrest.

181.     Alternately stated, the CITY OF NEW YORK maintained a *de facto* policy, practice and/or custom of providing a police escort to sanction unpermitted OWS marches to proceed in manners/areas ordinarily prohibited and then, minutes later, *without fair warning or notice of revocation of permission*, authorized the mass arrest of protestors for moving within or a part of the police escorted march.

182.     In September, 2011, Police Commissioner Kelly and Department Chief ESPOSITO discussed the subject of Occupy Wall Street marches that were then-recurring without benefit of a written advance permit(s) issued by the City. These communications, at times, occurred in official meetings. ESPOSITO's job responsibilities included updating Kelly on current issues, including the OWS protests. ESPOSITO would brief Kelly on what police plans were, and Kelly would comment, including indicating approval or disapproval or offering his input to alter plans.

183.     On one or more occasions, Kelly and ESPOSITO discussed and formulated what the police response would be to unpermitted Occupy Wall Street marches.

184.     By a date no later than September 23, 2011, the CITY OF NEW YORK acting through policy makers Kelly and ESPOSITO made policy determinations regarding what the NYPD response would be to "unpermitted" Occupy Wall Street marches, meaning those marches that initiated without benefit of an advance written permit from City or police authorities.

185.     The CITY OF NEW YORK established and implemented a *de facto* policy that it would permit and sanction OWS marches to occur, effectively waiving enforcement of administrative code provisions stating such marches needed "a required written permit" to lawfully occur and waiving enforcement of disorderly conduct ordinances that prohibit vehicular or pedestrian obstruction.

186.     This *de facto* policy, practice or custom was constitutionally defective. It did not require fair notice or warning to marchers prior to mass arrest for engaging in actually or apparently sanctioned marching conduct. In the alternative, this *de facto* policy, practice or custom implicitly or actually authorized the mass arrest of protestors for engaging in actually or apparently permitted conduct without provision of fair notice or warning and opportunity to comply with lawful police directives.

187.     The CITY OF NEW YORK, Kelly and ESPOSITO were aware, knew or believed that by operation of municipal administrative code, the OWS marches ordinarily needed "a required written permit" to lawfully occur. *See* New York City Admin. Code § 10-110(a).

188.     The CITY OF NEW YORK, Kelly and ESPOSITO believed that the unpermitted OWS marches violated disorderly conduct ordinances by obstructing pedestrian and/or vehicular traffic and established a *de facto* policy, practice and/or custom of permitting such marches to proceed notwithstanding such obstruction.

189.     The CITY OF NEW YORK, Kelly and ESPOSITO established a *de facto* policy, custom or practice of permitting these otherwise unpermitted marches to initiate and proceed.

190.     The aforementioned policy, custom or practice contemplated or encompassed or authorized that marchers would move on the roadways in manners ordinarily prohibited, including having police directing marchers at times to cross intersections against traffic signals or to otherwise move upon roadways in manners ordinarily prohibited.

191.     The aforementioned policy, custom or practice contemplated or authorized use of police to block vehicular traffic in order to facilitate the movement of the OWS marchers.

192.     The policy or practice or custom of permitting otherwise unpermitted OWS marches was unconstitutional because it either implicitly authorized mass arrest without fair warning or notice of revocation of permission or, in the alternate, did not require the issuance of fair warning or notice of revocation of

permission to march prior to the initiation of mass arrest for marching related conduct.

193.    Commissioner Kelly and Chief ESPOSITO were on actual notice as to the constitutional defect inherent in the above-referenced *de facto* policy of sanctioning otherwise unpermitted marches and engaging in arrests without issuance of fair notice or warning. In connection with the 2004 Republican National Convention (RNC), the City adopted an RNC-specific policy of sanctioning unpermitted marches, similar to the adoption of the OWS-specific *de facto* policy of sanctioning unpermitted marches. The City's Legal Guidelines for the RNC provided the NYPD would "accommodate . . . marches, whether planned or unplanned." However, as identified by the CCRB in a policy recommendation dated May 9, 2006, the NYPD lacked sufficient training or policies to ensure fair warning or notice prior to arrest. In other words, the NYPD's policies or practices countenanced arrests without notice. The CCRB formally recommended that "[t]o reasonably accommodate such marches, it is imperative that police deliver orders in a manner that civilians can hear and understand with which they can comply." The CCRB recommended supervisors be trained to "give protestors audible and unambiguous notice as to what behavior is expected of them and an opportunity to comply before they are arrested." The municipality, acting through Commissioner Kelly, rejected the CCRB's recommendation. Nevertheless and again, the CITY implemented in connection with the OWS marches the practice of not requiring fair warning or notice, or unambiguous and audible orders, prior to the mass arrest of persons marching in marches that had been apparently or actually sanctioned by the police.

194.    This *de facto* policy, practice or custom encompassed the provision of police escorts to the OWS marches, which communicated that the City was sanctioning movement within the police escorted march. The City implicitly or actually authorized the mass arrest of persons moving as part of the police escorted march without fair warning or notice of revocation of sanction or permission to march. In the alternative, this practice was constitutionally defective and deliberately indifferent to the constitutional rights of protestors in that it did not require fair warning or notice of revocation of permission (and opportunity to comply with lawful police directives) prior to the mass arrest of those participating in the police escorted march.

195.    The mass false arrest of the plaintiff, was ordered or approved or ratified by command staff and by NYPD policy makers with sufficient authority as to constitute agency policy makers.

196.    The named defendants have been deliberately indifferent to the violation of plaintiff's constitutional rights.

197.    The named defendants have failed to adequately train or instruct the NYPD and its officers so as to prevent the foreseeable violation of the clearly established rights of protesters to be able to engage in peaceable assembly and free speech without being subject to false arrest.

198.    Named defendants have failed to properly train officers regarding: the constitutional requirements to give fair notice prior to the initiation of mass protest arrests, including in particular when the target arrest group includes individuals for whom there is not probable cause to arrest; the constitutional prohibitions against indiscriminate or dragnet-style arrests in the absence of individualized probable cause when using police lines or netting to arrest groups of protesters; the constitutional requirement of *mens rea* and knowledge or fair notice before causing or justifying arrests for parading without a permit or disorderly conduct; the constitutional requirements to provide fair notice where, having permitted a march to proceed in the absence of an advance written permit, the police seek to impose restrictions on the manner of conduct of the march or to revoke permission for the march; the constitutional prohibition against arresting marchers absent fair notice for proceeding where police have granted actual or apparent permission for a march to so proceed; the constitutional requirements that fair notice be heard/received by all persons subject to potential arrest regardless of the noise that demonstration groups may be making and/or the distance over which the targeted group or march may be spread; and in the constitutional impropriety of applying "disorder control" tactics against non-violent First Amendment protected assembly.

199.    The above-referenced policies, practices and/or customs, and also the failure to properly train NYPD officers, constitute deliberate indifference on the part of the policymakers of the CITY OF NEW YORK and of the NYPD, and by the named defendants, to the constitutional rights of protesters as well as all those who would associate with such protesters.

**VIOLATIONS OF CLEARLY ESTABLISHED LAW**

200.    The actions of the above-referenced defendants violated the following clearly established and well settled federal constitutional rights:

    a.  Freedom from the unreasonable seizure of one's person;

    b.  Freedom from government disruption of, interference with, or retaliation for, engagement in free speech, assembly and association activities;

    c.  Freedom from deprivation of liberty absent, or in violation of, Due Process of law.

201.    Clearly established constitutional law was violated in this case where police permitted the march to occur and failed to issue fair notice (audible or

understandable to the group that was subject to arrest) that permission had been revoked before the police engaged in arrests of the plaintiff.

202.     Clearly established law was violated where police permitted the march (and actually led the march) to be present upon an ordinarily prohibited area and then, just minutes later, arrested the marchers for having marched without permission or for being in an ordinarily prohibited area.

203.     Even assuming *arguendo* that the bullhorn warning at the base of the bridge could possibly have been heard by some set of persons, and further assuming *arguendo* that the subsequent police permission to use the roadway was not superceding, clearly established law was violated for the defendants to have imputed alleged culpability to the hundreds of others who were marching in the same march and who were not a part of, nor privy to, that interaction.

204.     Clearly established law was violated where the plaintiff of 700+ persons was arrested in the absence of an objectively reasonable probable cause determination particularized to the plaintiff in its entirety or to each and every one of the individual class members.

205.     Clearly established law was violated where prior to the initiation of the arrest of the plaintiff, fair notice was not issued including orders to comply or disperse issued in a manner reasonably likely to have reach all of the crowd despite any noise the demonstrators may have been making.

206.     Clearly established law was violated in that the plaintiff was arrested without fair notice to the group as a whole, followed by time and opportunity to comply and a refusal to quit.

207.     NYPD Command Staff, identified and unidentified, participated in, caused, approved or ratified the arrest of the plaintiff. This included through issuing or approving or ratifying the order to arrest the class. Additionally, individual supervisory officers had the duty to exercise appropriate command authority in their supervision of their subordinates and failed to do so, resulting in the unconstitutional deprivations complained of herein. Individual officers had the duty to intervene to prevent or halt unlawful and/or unconstitutional conduct complained of herein, including the mass false arrest of the class.

208.     No objectively reasonable officer or official could have participated or caused or approved or ratified the arrest of the plaintiff with knowledge of these circumstances constituting violations of clearly established law.

**BRIEF HISTORY INCLUDING PRIOR EXECUTIONS OF
UNCONSTITUTIONAL MASS PROTEST ARRESTS USING TACTICS
CHALLENGED HEREIN**

209.    The policies, practices and customs challenged herein are an outgrowth of the "Disorder Control Guidelines" that were issued by Police Commissioner Kelly in the political aftermath of the Crown Heights riots in 1991.

210.    In November, 1993, Police Commissioner Raymond W. Kelly released the NYPD's Disorder Control Guidelines, which to this day constitute the "playbook" the NYPD has used with little distinction between response to violent riots or peaceful free speech assembly. See Sean Gardiner and Tamar El-Ghobashy, Demonstration Tests Police Playbook: Crown Heights Riots Defined NYPD Tactics, Wall St. J., Oct. 18, 2001, at A21.

211.    The use of orange mesh netting to trap and arrest protesters and engage in indiscriminate mass arrests in the absence of individualized probable cause, was initiated as part of Commissioner Kelly's NYPD Disorder Control Guidelines and practice.

212.    The City, under Commissioner Kelly and Mayor BLOOMBERG, has repeatedly deployed police ostensibly engaged in "disorder control" to execute mass arrests of peaceful protesters, indiscriminately, in the absence of individualized probable cause, and without fair notice, warnings or orders to disperse to those subject to arrest.

213.    *Carlyle Group Trap and Arrest.* On April 7, 2003, the NYPD conducted a mass arrest of demonstrators who were standing on a midtown sidewalk during a protest against the invasion of Iraq across the street from the offices of the Carlyle Group. A group of protesters were engaged in a lawful and law-abiding sidewalk demonstration and had left space for pedestrians. A double cordon formation of police in riot gear, without warning or notice or cause, surrounded the protesters and passers-by who happened to be walking on the same sidewalk. There was no opportunity to disperse or comply with any directive and no directive was given. Everyone trapped within the police line cordon was arrested, indiscriminately. Ultimately, the City resolved a civil lawsuit asserting false arrest claims for compensation and fees in excess of $2 million. See Jim Dwyer, One Protest, 52 Arrests and a $2 Million Payout, N.Y. Times, Aug. 20, 2008, at B1; Kunstler v. City of New York, Civil Action No. 03-CV-02819-RWS, Southern District of New York (filed February 11, 2004, terminated August 22, 2008).

214.    *2004 RNC Mass Arrests.* Multiple executions of the trap-and-arrest and indiscriminate tactics were perpetrated under the auspices of defendants Kelly and BLOOMBERG in connection with the 2004 Republican National Convention in New York City. According to the New York Times, 1,806 persons were arrested in connection with RNC protests, and "[c]harges were ultimately dropped against 90 percent of them." Jim Dwyer, City Fights Efforts to Release 2004 Convention Arrest

Records, N.Y. Times, Dec. 13, 2006, at B2; Jim Dwyer, <u>Videos Challenge Hundreds of Convention Arrests</u>, N.Y. Times, Apr. 12, 2005, at A1. These trap-and-arrests occurred at multiple times and locations.

215.     In one RNC-related mass arrest, the Manhattan district attorney's office admitted it could not prosecute cases against 227 protesters. In a statement to the Court, Assistant District Attorney William Beesch admitted "The police likely created the impression among the participants that the march [which lacked an advance written permit] had official sanction." Sabrina Tavernise, <u>Prosecutors Won't Pursue Case of 227 in Disputed Protest</u>, N.Y. Times, Oct. 7, 2004, at B2.

216.     Kelly continued to ratify the arrests notwithstanding.

217.     By 2008, false arrest lawsuits from the 2004 RNC had cost the City over $8.2 million according to city officials. Jim Dwyer, <u>'04 Cases Still in Limbo After Arrests in St. Paul</u>, N.Y. Times, Sept. 6, 2008, at B1.

218.     On May 19, 2011, the Honorable Richard J. Sullivan granted in part class action certification for outstanding claims for constitutional claims of approximately 1,500 RNC-related arrestees. <u>MacNamara v. City of N.Y.</u>, 275 F.R.D. 125 (S.D.N.Y. 2011).

219.     Judge Sullivan observed that no less than 44 RNC-related cases had been filed and consolidated. <u>Id.</u> at 138.

220.     The RNC involved widespread and pervasive incidents of mass arrests, including "[o]n August 27, 2004 on Seventh Avenue between 34th and 35th Streets, between 6:30 p.m. and 9:30 p.m." <u>Id.</u> at 133, "[o]n August 27, 2004, on 35th Street between Tenth Avenue and Dyer Avenue, between 8:00 pm. and 11:00 p.m.," <u>id.</u>, "[o]n August 27, 2004, on Second Avenue between 9th and 10th Streets, between 8:00 pm. And 11:00 p.m.," <u>id.</u>, "[o]n August 29, 2004, on 37th Street between Seventh Avenue and Broadway, between 12:00 p.m. and 3:00 p.m.," <u>id.</u> at 134,"[o]n August 31, 2004, on Fulton Street between Church and Broadway," <u>id.</u>, "[o]n August 31, 2004, on 16th Street between Union Square East and Irving Place, between 7:00 p.m. and 10:00 p.m.," <u>id.</u>, "[o]n August 31, 2004, on 17th Street between Fifth Avenue and Broadway, between 8:00 and 10:00 p.m.," <u>id.</u>, and "[o]n August 31, 2004, on 35th Street between Fifth and Sixth Avenues, between 7:00 and 10:00 p.m.," <u>id.</u> at 135.

221.     Front page news stories in national newspapers reported harsh criticism of the NYPD's indiscriminate mass arrests of protest groups made without fair notice or warnings and in the absence of individualized probable cause. <u>See, e.g.</u>, Michael Slackman and Diane Cardwell, <u>Police Tactics Mute Protesters and Messages</u>, N.Y. Times, Sept. 2, 2004, at A1 ("Using large orange nets to divide and conquer, and a near-zero tolerance policy for activities that even suggest the prospect of disorder, the New York Police Department has developed what amounts to a pre-emptive strike policy, cutting off demonstrations before they grow large enough, loud enough, or unruly enough to affect the convention."); Michael Powell and Michelle Garcia, <u>Arrests at GOP Convention Are Criticized</u>,

Washington Post, September 20, 2004 at A1 ("Officers often sealed off streets with orange netting and used motor scooters and horses to sweep up hundreds of protesters at a time, including many who appeared to have broken no laws. In two cases, police commanders appeared to allow marches to proceed, only to order many arrests minutes later.").

222.        In connection with the RNC mass arrests, BLOOMBERG has approved or ratified, or in the alternate has knowingly tolerated, the indiscriminate mass false arrest of groups of protesters in the absence of individualized probable cause.

223.        On his weekly WABC news show, BLOOMBERG justified indiscriminate arrests and stated, "If you go to where people are protesting and don't want to be part of the protest, you're always going to run the risk that maybe you'll get tied up with it." Michael Powell and Michelle Garcia, Arrests at GOP Convention Are Criticized: Many in N.Y. Released Without Facing Charges, The Wash. Post, Sept. 20, 2004, at A1.

224.        Commissioner Kelly has explicitly ratified and defended the mass false arrests in connection with the 2004 Republican National Convention, even in response to a Civilian Complaint Review Board letter which sharply criticized police conduct in connection with two specific RNC mass arrests and which specifically recommended additional training for officers. Kelly ratified the arrests stating, "[T]he implication that the N.Y.P.D. failed during the R.N.C. turns truth on its head." Kelly stated "The policing of the R.N.C. was one of the Police Department's finest hours." According to the New York Times, referring to the RNC protest arrests, Kelly stated that the police are not obligated to give warnings before arrests. See Al Baker, 2 Top Officers Are Criticized for '04 Arrests, N.Y. Times, May 10, 2006, at B5.

225.        *September 24, 2011 Union Square Trap and Arrest.* One week prior to the October 1, 2011 mass arrest, on September 24, 2011, the NYPD implemented the indiscriminate trap-and-arrest tactic in connection with an Occupy-related march to Union Square. After the march and assembly had disbanded and departed Union Square, persons sought to return to Zuccotti Park by foot.

226.        At the intersection of 12th & University Place, there was an incident involving police throwing protesters to the ground, striking and arresting multiple individuals. The NYPD used orange netting to trap indiscriminately persons who were in the vicinity, specifically including those who were lawfully and peaceably on the sidewalk. Deputy Inspector Anthony Bologna approached and without cause or justification used pepper spray against a number of women stopped within orange netting on the north sidewalk of E. 12th Street. After this assault, for which Bologna has reportedly been laxly disciplined, the police removed that netting. At least one of the women who had been pepper sprayed crossed the street and was present lawfully and peacefully with others, approximately 30 – 40 in number, who were on the south sidewalk of East 12th Street. The police then, without warning or notice, surrounded those on the south sidewalk and arrested

the entire group of persons in the absence of probable cause, fair notice or warning.

227.    On information and belief, additional indiscriminate arrests may have occurred on this day.

228.    On information and belief, additional incidents of prior uses of the challenged tactics in the context of mass protest arrests may exist and will be determined within discovery.

229.    Defendants Kelly and BLOOMBERG and the CITY OF NEW YORK have adopted the trap-and-arrest tactic and other or related policies, practices and customs challenged herein in order to disrupt targeted protest actions, to sweep the sidewalks and public ways of targeted protest actions, to demoralize and chill targeted protests and free speech activities.

230.    In the alternative, defendants Kelly and BLOOMBERG and the CITY OF NEW YORK knew or should have know of the unconstitutional policies, practices and customs challenged herein and have failed and refused to take corrective action, thereby perpetrating their continued existence and mass violation of constitutional rights. Defendants Kelly, BLOOMBERG and the CITY OF NEW YORK have known, or should have known, of these unconstitutional policies, practices or customs as a consequence of complaints (including but not limited to multiple civil lawsuits) asserting constitutional violations in the context of protest activity; from the occurrence of over 1,800 incidents of arrests in connection with the 2004 RNC alone, over 90% of which resulted in dismissals or acquittals; from the millions of dollars in compensation that the City has paid in resolution of such complaints that have been resolved by settlement; from the ordinary after-action review and reporting of police conduct after mass demonstrations; from the major national news media articles or stories that have reported on the indiscriminate mass arrest tactics of the NYPD; and from other sources of information and communication.

231.    Defendant Kelly is responsible for the NYPD's "disorder control" practices, including those challenged herein.

232.    Kelly tacitly or explicitly participated in, approved and/or ratified the conduct of the October 1, 2011 mass arrest.

233.    In the alternate, Kelly was grossly negligent in monitoring the conduct of subordinates in the mass arrest.

234.    Kelly was in communication with subordinates regarding the march as it progressed, including the police response.

235.     Kelly possessed the authority to, but did not cease the mass arrests or cause the release of arrestees.

236.     On information and belief, Defendant BLOOMBERG considers the conduct of the NYPD in response to First Amendment protected assemblies to be a fundamental characteristic of his administration, and he approves of the use of the police to engage in the mass arrests as described and challenged herein.

237.     BLOOMBERG actively participates in the management of the NYPD to ensure it functions in the manner in which he intends. "I have my own army in the NYPD, which is the seventh largest army in the world," stated BLOOMBERG on November 29, 2011.

238.     With respect to the Saturday, October 1, 2011 mass arrest, on the immediately following Sunday, Mayor BLOOMBERG ratified the mass arrest of the plaintiff stating, "The police did exactly what they were supposed to do." Mosi Secret, Police, Too, Release Videos of Brooklyn Bridge Arrests, N.Y. Times, Oct. 3, 2011, at A22.

239.     On information and belief, BLOOMBERG issued his October 2, 2011 ratification of the plaintiffs' mass arrest only after he had satisfied himself that he had reviewed and possessed sufficient information for him to issue such an after-the-fact ratification on an informed and knowledgeable basis.

240.     On December 6, 2011, Jerrold Nadler, the Ranking Member of the House Judiciary Committee's Subcommittee on the Constitution, as well as the representative of Lower Manhattan, sent a letter to Attorney General Eric Holder specifically citing the Brooklyn Bridge mass arrest among three incidents that "are worthy of investigation."  Rep. Nadler requested the Department of Justice investigate whether the "unlawful targeting of individuals based in their participation in constitutionally protected activities, occurred."

241.     Nadler wrote "many of the marchers allege that they were under the impression that the march was a lawful one, that they observed officers directing them onto the bridge, and that they never heard warnings that they would be subject to arrest." Nadler requested:

"I urge you to determine whether these actions constituted a deprivation of rights under color of law in violation of 18 U.S.C. §§241 and 242, **whether the NYPD engaged in a pattern or practice of conduct that deprived individuals of rights protected by the Constitution** or laws of the United States in violation of 42 U.S.C. § 14141, and what can be done to prevent similar actions that violate people's civil and constitutional rights under color of law in these and similar situations."

Dec. 6, 2011 Letter from Rep. Nadler to Attorney General Holder (emphasis added)

242.     Kelly and BLOOMBERG rejected the call for such investigation, again approving and ratifying the conduct at bar and rejecting corrective action or even outside review.

243.     Mayor BLOOMBERG called the request for investigation "ridiculous."

244.     On December 7, 2011, NYPD spokesperson Paul Browne, presumably with the approval of Commissioner Kelly, ratified and defended the Brooklyn Bridge arrests as warranted.

245.     As a direct and proximate result of the acts or omissions of the defendants identified in this complaint and the other unidentified persons acting jointly, the plaintiff has suffered monetary and non-monetary harm, including deprivation of his constitutional rights under the First and Fourth Amendments to the U.S. Constitution and the Due Process Clause, loss of liberty and related suffering and harm, and violation of state and common law rights to be free of unlawful arrest and false imprisonment.

## FIRST CLAIM FOR RELIEF
## DEPRIVATION OF FEDERAL CIVIL RIGHTS UNDER 42 U.S.C. §1983

246.     Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

247.     All of the aforementioned acts of the Defendant CITY OF NEW YORK, and the individual defendants and their agents, servants, and employees, were carried out under the color of state law.

248.     All of the aforementioned acts deprived Plaintiff of the rights, privileges and immunities guaranteed to citizens of the United States by the First, Fourth, Fifth, Eight, and Fourteenth Amendments to the Constitution of the United States of America, and in violation of 42 U.S.C. §1983.

249.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, with all of the actual and/or apparent authority attendant thereto.

250.     The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to their customs, usages, practices, procedures, and the rules of the City of New York and

the New York City Police Department, all under supervision of ranking officers of said department.

251.         The individual defendants, and defendant CITY OF NEW YORK, collectively and individually, while acting under color of state law, engaged in Constitutionally violative conduct that constituted a custom, usage, practice, procedure, or rule of the respective municipality/authority, which is forbidden by the Constitution of the United States.

252.         As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer psychological and emotional injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to his reputation and his standing within his community.

## SECOND CLAIM FOR RELIEF
## FALSE ARREST UNDER 42 U.S.C. §1983

253.         Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

254.         Plaintiff was arrested in the absence of probable cause, at the direction of, or under practices, policies or customs promulgated by the NEW YORK POLICE DEPARTMENT and CITY OF NEW YORK.

255.         As a result of the aforesaid conduct by defendants, plaintiff was subjected to illegal, improper and false arrest by the defendants and taken into custody and caused to be falsely imprisoned, detained and confined without any probable cause, privilege or consent.

256.         As a result of the above constitutionally impermissible conduct, plaintiff was caused to suffer psychological and emotional injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to his reputation and his standing within his community.

257.         As a result of defendants' impermissible conduct, plaintiff demands judgment against defendants in a sum of money to be determined at trial.

## THIRD CLAIM FOR RELIEF
## MALICIOUS PROSECUTION UNDER 42 U.S.C. §1983

258.         Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

259.         At the aforementioned times and locations, plaintiff was detained and held under the imprisonment and control of the defendants under false pretenses.

260.         Defendants commenced the criminal action against plaintiff in the absence of any probable cause that a crime had been committed.

261.         Defendants commenced this criminal action out of malice.

262.         The criminal action against plaintiff has terminated in his favor.

263.         That the acts and conduct on the part of the individual defendants constituting the false arrest and false imprisonment consisted in part of the following: unlawfully and intentionally detaining and confining plaintiff against his will and without his consent; unlawfully and intentionally detaining and confining plaintiff without privilege, probable cause or valid legal process; unlawfully detaining and confining plaintiff through the unlawful arrest of plaintiff; unlawfully detaining and confining plaintiff; unlawfully arresting plaintiff and placing him in handcuffs without reasonable cause therefore, and committing such other acts resulting in the unlawful arrest and imprisonment of plaintiff.

264.         That at all times hereinafter mentioned, said arrest, confinement and restraint of liberty was not otherwise privileged.

265.         That plaintiff was conscious of the confinement.

266.         That as a direct, sole and proximate result of the false arrest, imprisonment, and excessive force, plaintiff was caused to and did sustain humiliation and embarrassment, emotional and mental distress, moral and mental degradation, indignity and disgrace, injury to personal reputation, inconvenience, disturbance and disruption of life, legal expenses, and loss of personal income.

267.         By the actions described above, the individual and municipal defendants caused plaintiff to be falsely arrested and/or falsely imprisoned plaintiff without probable cause, without reasonable suspicion, illegally, without any proper claims, and without any right or authority to do so. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to the plaintiff and violated his statutory and common law rights as guaranteed by the law of the Constitution of the United States.

268.         As a result of the above constitutionally impermissible conduct, plaintiff was caused to suffer psychological and emotional injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to his reputation and his standing within his community.

## FOURTH CLAIM FOR RELIEF
## VIOLATION OF AND RETALIATION FOR
## THE EXERCISE OF RIGHTS AND FREE SPEECH AND ASSEMBLY UNDER
## 42 U.S.C. §1983

269.        Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

270.        By the actions described above, the defendants violated, and retaliated for the exercise of the free speech and assembly rights of the plaintiff. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to plaintiff and violated his statutory and common law rights as guaranteed by the United States Constitution, and the laws and Constitution of the State of New York.

271.        At or around the times that Plaintiff came into contact with POLICE OFFICER GLENN HUDECEK, and other named defendants, Plaintiff was or had recently been engaging in protected speech and conduct, including but not limited to peaceably assembling in public streets for the purpose of engaging in First Amendment protected expression related to critical social issues; and walking and being present in proximity with persons peaceably assembling in public streets for the purpose of engaging in First Amendment protected expression related to critical social issues.

272.        POLICE OFFICER GLENN HUDECEK, and other named defendants, took adverse action against Plaintiff for engaging in such protected speech and conduct.

## FIFTH CLAIM FOR RELIEF
## MUNICIPAL LIABILITY UNDER MONELL ARISING FROM
## UNCONSTITUTIONAL POLICIES AND CUSTOMS UNDER 42 U.S.C. §1983

273.        Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

274.        Defendants arrested and incarcerated plaintiff in the absence of any evidence of criminal wrongdoing, notwithstanding their knowledge that said arrest and incarceration would jeopardize the plaintiff's liberty, well-being, safety and constitutional rights.

275.        The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials, with all the actual and/or apparent authority attendant thereto.

276.        The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to the customs, policies, usages, practices, procedures, and rules of the CITY OF NEW YORK and the NEW YORK POLICE DEPARTMENT, all under the supervision of ranking officers of said department.

277.        The aforementioned customs, policies, usages, practices, procedures and rules of the CITY OF NEW YORK and the New York City Police Department include, but are not limited to, the following unconstitutional practices:

a)  wrongfully arresting individuals engaged in first amendment protected expression without probable cause due to perceived lack of respect for the police officer (i.e., "contempt of cop" arrests of persons engaged in first amendment protected expression);

b)  wrongfully arresting individuals engaged in first amendment protected expression without probable cause in attempts to justify excessive uses of force against same (i.e. "contempt of cop" "cover charge" arrests; condoning brutality);

c)  wrongfully arresting innocent persons engaged in first amendment protected expression in order to meet quantitative "productivity goals" (i.e., arrest quotas).

d)  wrongfully arresting persons without probable cause due to perceived lack of respect for the police officer; in order to teach a lesson in respect while also satisfying quantitative "productivity goals" (i.e., "contempt of cop" arrests used to satisfy arrest quotas).

e)  the pervasive failure to supervise, train, instruct and discipline police officers with respect to the constitutional rights of citizens, and encouraging the ensuing misconduct through condoning officers' widespread custom or practice known as the "Blue Wall of Silence," wherein officers deliberately frustrate official and departmental oversight by discouraging officers from reporting corrupt or unlawful acts of other police officers, and by retaliating against officers who report police misconduct (condoning pervasive constitutional violations and concomitant "Blue Wall of Silence" cover-ups of same)

f)  wrongfully arresting persons observing, documenting, or commenting upon police actions in violation of the consent decree in *Black et al. v. Codd et*

33

*al.*, United States District Court, Southern District of New York, 73 Civ. 5283 ("Consent Decree").

278.        The Consent Decree states at 2 that: "[n]one of the following constitutes probable cause for the arrest or detention of an onlooker [to a police action] unless the safety of officers or other persons is directly endangered or the officer reasonably believes they are endangered or the law is otherwise violated: (a) Speech alone, even though crude and vulgar; (b) Requesting and making notes of shield numbers and names of officers; (c) Taking photographs; (d) Remaining in the vicinity of the stop or arrest."

279.        This understanding memorialized in the Consent Decree is codified in the NYPD Patrol Guide at PG §208-03, subsection "Observers At The Scene of Police Incidents."

280.        Despite due and repeated notice of the First Amendment rights of citizens in the vicinity of police actions, those same rights have been disregarded flagrantly and repeatedly throughout the course of Occupy Wall Street by members and ranking officers of the NYPD alike.

281.        Officers of the NYPD took adverse action against the aforesaid Plaintiff and other persons similarly situated in deliberate efforts to chill the First Amendment protected expression of persons observing, recording, and/or commenting upon police actions undertaken in the course of Occupy Wall Street.

282.        The existence of the above-described unlawful *de facto* policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and Defendant CITY OF NEW YORK.

283.        The actions of the individual police defendants resulted from and were taken pursuant to the above-mentioned *de facto* policies and/or well-settled and widespread customs and practices of Defendant CITY OF NEW YORK, which are implemented by the NYPD, of engaging in systematic and ubiquitous perjury, both oral and written, to cover-up federal law violations committed against civilians by either themselves or their fellow officers, supervisors and/or subordinates.

284.        They do so with the knowledge and approval of their supervisors, commanders who all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to report other officers' misconduct or tell false and/or incomplete stories, *inter alia*, in sworn testimony, official reports, in statements to the CCRB and IAB, and in public statements designed to cover for and/or falsely exonerate accused police officers; and (ii) encourage and, in the absence of video evidence blatantly exposing the officers' perjury, fail to

discipline officers for "testilying" and/or fabricating false evidence to initiate and continue the malicious prosecution of civilians in order to cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors and/or subordinates against those civilians.

285.        As a result of the aforementioned conduct of the Defendant CITY OF NEW YORK and the individual defendants, Plaintiff' constitutional rights were violated.

286.        As a result of the above constitutionally impermissible conduct, Plaintiff was caused to suffer personal injuries, violation of their civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, loss of wages and damage to their reputations and standings within their communities.

287.        As a result of the aforementioned conduct of the defendant CITY OF NEW YORK, and the individual defendants, plaintiff's constitutional rights were violated.

288.        As a result of the above constitutionally impermissible conduct, plaintiff was caused to suffer psychological and emotional injuries, violation of his civil rights, emotional distress, anguish, anxiety, fear, humiliation, loss of freedom, and damage to his reputation and his standing within his community.

289.        As a result of the defendants' impermissible conduct, plaintiff demands judgment against defendants in a sum of money to be determined at trial.


**WHEREFORE**, plaintiff demands the following relief jointly and severally against all of the defendants:

a. Compensatory damages;
b. Punitive damages;
c. The convening and empaneling of a jury to consider the merits of the claims herein;
d. Costs and interest and attorney's fees;
e. Such other and further relief as this court may deem appropriate and equitable.

DATED:

New York, New York
April 30, 2015

Respectfully submitted,

**The Law Office of
Christopher H. Fitzgerald**
*Counsel for Plaintiff, Jon Savoy*

_____/s/_____
By: Christopher H. Fitzgerald, Esq.
(CF-1415)
233 Broadway, Suite 2348
New York, NY 10279
(212)226-2275